TEX. & PAC. R'Y CO. v. B. E. S. PEARL.

(No. 2006.)

APPEAL from Gregg County. Opinion by WHITE, P. J.

JAMES TURNER, counsel for appellant.

RAGLAND & DE GRAFFENREID, counsel for appellee.

§ 4. *Railroad company may prevent person from drumming for a hotel, etc., on its trains; mode of prevention in such cases; rules upon this subject; case stated.* Pearl instituted this suit and recovered the judgment appealed from, on a claim for damages against the appellant for injuries done him by an unwarranted and aggravated assault and battery, committed upon him by the conductor in charge of appellant's passenger train, he, Pearl, being at the time a passenger on said train, having paid his fare, etc. In amount the judgment is for $975. As shown by the evidence in the record, the facts in brief were, that Pearl kept a hotel at Longview. There was also a railroad hotel or eating-house at that place, run in the interest of or in connection with the railroad. Several times before the occasion in question, Pearl had boarded the trains of appellant at Hallville, a station east of Longview, and had distributed circulars and drummed the passengers for custom for his hotel, claiming that he could give them as good a meal for twenty-five cents as the railroad house would give for seventy-five cents. He had been told each time by the conductor in charge of

the trains, that he was violating a rule of the company which prohibited such drumming on its cars; but he claimed the right to drum on the cars, and persisted in doing so, until he and one of the conductors got into an altercation in which Pearl's finger was dislocated. A short time after this occurred, to wit, on April 14, 1885, Pearl walked to Hallville to get a letter which he learned was in the postoffice there, addressed to him, and he there purchased a passenger ticket for Longview from appellant's agent, and boarded the train when it arrived. After the train had been in motion some time, and whilst Pearl was standing in the aisle of the car, conversing with a fellow passenger on business, the conductor approached and told him to sit down; that he could not drum that train; that he must take a seat and keep it, and he, the conductor, took hold of him by the hand and shoulder and pushed him into a seat, and held him there for awhile, though Pearl told the conductor at the time that he was not drumming, nor had he tried to drum the train. After remaining in the seat where the conductor had placed him some time, he arose up to go into another car to avoid the gaze of the passengers whose attention had been attracted to him by said assault, when the conductor again pushed him back in his seat, and kept him there until the train arrived at Longview. In being pushed back the second time his finger was broken and dislocated in the scuffle. He testified he had suffered great pain from this injury; was unable to sleep for several nights, and was unable to do his usual work up to the date of filing this suit. The conductor testified that he did not see Pearl drum before he approached him, but saw a circular in his hand and concluded he was going to drum as usual; and his statement of the two assaults made by him upon Pearl agrees substantially with the other evidence, except that he denied that Pearl told him that he was not on the train for the purpose of drumming it.

The foregoing statement will sufficiently present and

illustrate the main questions in the case, which are: 1. Is it lawful for railroad companies to adopt rules and regulations prohibiting passengers who have paid their fare, from drumming trains for custom for hotels, etc.? 2. If such right is lawful, and such regulations have been adopted, what is the remedy of the company in case of the persistent violation or disregard by a passenger of such regulation? In his work on Carriers of Passengers Mr. Thompson says, upon the subject of the exclusion of "runners" from carriers' vehicles and premises, "the well established right of carriers to make reasonable regulations for the conduct of passengers and others transacting business upon their premises is accompanied by the right to exclude from their premises persons having no business with the carrier, and whose presence would be detrimental to his interests, or the safety and convenience of passengers. This rule follows naturally from the strict accountability to which the carrier is held for the safety of passengers and goods intrusted to his charge. . . . Thus, it has been held proper to exclude by force, if necessary, an innkeeper from a railroad depot, whose habit had been to enter the depot and annoy passengers by soliciting patronage for his house, having been previously notified that he must discontinue the practice. [Landrigan v. The State, 31 Ark. 50.] And such person's rights will not be enhanced in the premises, even though he has in his possession a ticket entitling him to passage upon defendant's railroad, and he enters the depot with the *bona fide* intention of taking the cars, if he fails to exhibit the ticket when ordered to leave the station, and his conduct is such as to induce the defendant's agent to believe that his intention is to continue to violate the regulations of the company. But the carrier's agent will not be justified in thus removing a person because in his judgment, and without proof of the fact, he has violated regulations of the company, although he had conducted himself offensively to such agent personally." [Thomp. on Carriers of Pass. p. 350, § 8; Com. v. Powers, 7 Metcalf, 596;

Hall v. Power, 12 Metcalf, 482; Hutch. on Carriers, § 546.] The leading case upon this subject is Jencks v. Coleman, 2 Sumner, 221, in which it was held that a common carrier is under no obligation to carry a drummer for a rival line. That was a case where a steamboat company had interdicted such agents from coming on board their boat, and had refused one of them passage in the boat, though he tendered the customary fare. Judge Story, delivering the opinion, said: "The right of passengers to a passage on board of a steamboat is not an unlimited right, but is subject to such reasonable regulations as the proprietors may prescribe for the due accommodation of passengers, and for the due arrangements of their business. The proprietors have not only this right, but the further right to consult and provide for their own interests in the management of such boats, as a common incident to their right of property. They are not bound to admit passengers on board who refuse to obey the reasonable regulations of the boat, or who are guilty of gross and vulgar habits of conduct, or who make disturbances on board. . . . Nor are they bound to admit passengers on board whose object it is to interfere with the interests or patronage of the proprietors so as to make the business less lucrative to them. . . . And, as passengers are bound to obey the orders and regulations of the proprietors unless they are oppressive and grossly unreasonable, whoever goes on board, under ordinary circumstances, impliedly contracts to obey such regulations, and may justly be refused a passage if he wilfully resists or violates them." It is contended that, such being the law, and Pearl having previously, on several occasions, violated this proper, needful and useful regulation of the company (prohibiting "drumming" on its trains), though he had been notified of such regulation, and requested to desist violating the same, the conductor had the right to presume that he was, in this instance, on board the train for his ordinary purposes, that is, to drum the train, and that such conductor had the right to

act upon such presumption, and prevent and repress him. On the other hand, it is claimed that, until Pearl had actually commenced drumming, the conductor had no right to inquire into his intent or motives.  In Jencks v. Coleman, *supra*, it is said: " I think the proprietors had the right to inquire into his intent and motives and to act upon the reasonable presumptions which arose in regard to them.  They might act upon the just presumption of what his conduct would be."  When, however, the conductor, acting upon this presumption, approached him to inquire about, or find out his intentions or motives, he was not authorized to assault him because he presumed Pearl's intentions and motives were to violate said regulation, and in such manner prevent him from carrying such intention into execution.  Pearl was not, at the time, violating the regulation, and he protested he did not intend to do so.  Even had he been engaged in its violation, the conductor would only be justified in using such force as was necessary to make him desist, and no more.  [Com. v. Power, 7 Metcalf, 596; 2 W. Con. Rep. § 305; 2 Wait's Act. & Def. 75, 76.]  Finding Pearl a passenger upon his train who had paid his fare, whilst from his previous acts and conduct the conductor might have been authorized to inquire into his motives and intentions, yet, until Pearl informed him that he intended again to violate the regulation, or until, having a knowledge of such regulation, he persisted in its violation, the conductor had no authority to use any force whatsoever against him.  If Pearl had again disregarded the regulation, the conductor's remedy was to eject him from the train.  [Hutch. Carriers, §§ 546–548.]  A passenger who refuses to obey a reasonable regulation of the carrier forfeits his right to be carried, and at once puts himself in the condition of an intruder, and may be ejected at any point upon the carrier's route at which he may choose to put him off. . . .  In putting him off, however, he must use no more force than may be necessary, and, should he resort to unnecessary violence, it will be no defense that the pas-

senger had offended against his rules, and had thereby subjected himself to the carrier's right to expel him. [2 W. Con. Rep. § 164, and authorities there cited.] As shown by the evidence, under the rules of law stated the assault by the conductor was illegal and unjustifiable, and such as rendered appellant liable in damages.

§ 5. *Conclusions of judge; failure to state upon all the issues involved, not cause for reversal, when.* The case was tried by the judge without a jury, and he was requested to state his conclusions of law and fact. It is insisted by appellant that the judge did not state his conclusions upon the distinct issues presented by appellant's pleading and evidence. We have mainly discussed those issues above, and the law thereon is against the positions advanced by appellant. Hence, we cannot conceive how appellant could be injured or prejudiced by such omission of the trial judge. If the judgment is correct, and we hold that it is, the failure of the judge to state his conclusions upon some of the issues, or the statement of erroneous conclusions, should not be cause for reversal. [Bank v. Scott, 61 Tex. 567; 2 W. Con. Rep. § 224.]

§ 6. *Witnesses may be put under the rule in a civil case.* The only bill of exception in the record is one saved by appellant to the action of the court putting the witnesses under the rule. It is claimed by appellant that there is no authority for applying the rule in a civil case. Mr. Greenleaf says: "If the judge deems it essential to the discovery of truth that the witnesses should be examined out of the hearing of each other, he will so order it. This order, upon the motion or suggestion of either party, is rarely withheld." [1 Greenl. Ev. (13th ed.) § 432; Sayles & Bassett's Pl. & Pr. § 541; 2 W. Con. Rep. § 321.] The matter of placing the witnesses under the rule is one confided exclusively to the discretion of the trial judge, and unless it is made plainly to appear that he has abused his discretion his action will not be revised. Such abuse is not shown in this instance.

October 17, 1885.                                    Affirmed.